Filed 9/1/16  P. v. Valenzuela CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LOUIS VALENZUELA,<br><br>    Defendant and Appellant. | B266045<br><br>(Los Angeles County<br> Super. Ct. No. BA423897) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Wilcox Clarke, Jr., Judge.  Affirmed.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Pursuant to a plea agreement, defendant Louis Valenzuela pled no contest to one count of child endangerment (Pen. Code, § 273a, subd. (a)), and one count of possession of a controlled substance with a firearm (Health and Saf. Code, § 11370.1, subd. (a)). He was sentenced to concurrent terms of two years on each count, and the remaining charges against him were dismissed.[1] He appeals from the denial of his motion under Penal Code section 1538.5 to suppress evidence seized from his apartment. We affirm.

## BACKGROUND[2]

*Prosecution Evidence*

On April 18, 2014, around 6:40 p.m., Deputy Michael Coberg and Detective Nikolai Vavakin of the Los Angeles County Sheriff's Department, who were on patrol near 144 North Poplar Avenue in east Los Angeles, observed Eddie Lopez, whom they wanted to question, walking on the street. The deputies pulled into the driveway of an apartment complex and got out, intending to contact Lopez.

Three men were nearby on the front porch of apartment D. One of the men, later identified by the last name Cabrera, was seated and drinking. When they observed the deputies, the two other men quickly got up, ran inside the apartment, and locked the door. Deputy Coberg observed one of them holding his waistband as if concealing a gun. Detective Vavakin recalled both men holding their waistbands as if concealing guns.

---

[1]    Those charges were possession of cocaine base for sale (Health & Saf. Code, § 11351.5), possession of methamphetamine for sale (Health & Saf. Code, § 11378), possession of marijuana for sale (Health & Saf. Code, § 11359), and an additional count of child endangerment (Pen. Code, § 273a, subd. (a)).

[2]    Our summary of the evidence is taken from the hearing on the motion to suppress evidence.

Deputy Coberg detained Cabrera, who remained outside. Deputy Coberg asked him if he had anything on him. Cabrera replied that he had "meth" in his pocket. Deputy Coberg searched him, seized the methamphetamine, and put Cabrera in the patrol car.

Meanwhile, Detective Vavakin tried the front door, and found it was locked. He began knocking, asked that the door be opened, and heard children's voices inside, talking and yelling. He was concerned for the welfare of the children, given that two men, possibly armed with handguns, had run into the apartment and locked the door. No one answered or acknowledged his presence.

After about a minute, defendant walked up the driveway, and told Detective Vavakin to stop knocking on the door. Detective Vavakin approached and asked defendant if the apartment was his. Defendant said that it was. Detective Vavakin explained that two men had run inside the apartment. Defendant said that he did not know them, and that, "I only have my kids in there." Detective Vavakin asked defendant if he had the keys. Defendant said that he did. Defendant either reached in his pocket and gave Detective Vavakin the keys, or permitted the Detective to take the keys from his pocket

While Detective Vavakin was talking with defendant, Deputy Coberg went to the house and began to knock on the apartment's door again. Inside, he heard fast moving footsteps and a female voice.

Detective Vavakin threw the apartment keys to Deputy Coberg, stating defendant had given them the keys to unlock the door and check inside. Meanwhile, Detective Vavakin asked defendant to wait with him at the patrol car.

Deputy Coberg used the keys to open the door, and inside observed a woman and two young children (around 10 years old), but not the two men who had run into the apartment. He instructed the woman and children to exit, and they complied. He asked the woman if she knew the two men who ran into the

3

apartment. She seemed confused, and said "I don't know anything. I don't know what's going on."

Deputy Coberg directed the woman and children to go to the yard, and ordered the two men to come out of the apartment. After a short time, they both complied.

Before entering the apartment, Deputy Coberg observed a shotgun leaning against the wall near a couch. While Detective Vavakin detained the two men who had come out of the apartment, Deputy Coberg "cleared" the apartment by briefly walking through the rooms (a bedroom, kitchen, living room, and one bathroom).

When Deputy Coberg exited, Detective Vavakin asked defendant for permission to search his apartment. Defendant shrugged his shoulders and pointed at the apartment. Detective Vavakin asked again, and appellant said, "Yeah, okay." During the search, the deputies found another shotgun underneath the bed of the master bedroom, two guns, cocaine, and small baggies in a coffee table in the living room, and two bags of marijuana, "about the size of . . . a baseball," on the kitchen table. In the drawers of the kitchen, the deputies found a bag of "pop top" containers commonly used to store marijuana, and over 60 glass pipes commonly used for smoking methamphetamine.

A few hours later, deputies searched appellant's apartment pursuant to a warrant. Deputies found a large quantity of methamphetamine inside what appeared to be an old "cookie container" in the kitchen.

*Defense Evidence*

From her window, Tina Estrada, a resident of the apartment complex, saw the deputies contact defendant outside his apartment. A tall deputy led defendant by the arm to the patrol car. Defendant's arms seemed to be behind his back, as if

4

handcuffed. The deputy took things out of appellant's pockets, and "tossed something to somebody."

Eddie Lopez arrived at the apartment complex when the patrol car pulled up behind him. A deputy got out and told him to put his hands on the hood of the car. They placed Lopez in the police car. According to Lopez, the deputies subsequently spoke with defendant. Defendant acknowledged that he lived in the apartment the men entered. The deputy asked for consent to enter the apartment, which defendant denied. But the deputy took keys out of defendant's pocket, and threw the keys to the other deputy. Defendant did not seem to be handcuffed. He told the deputies he did not know why men ran into his apartment.

*Trial Court's Ruling*

The trial court denied the suppression motion, ruling that the searches were reasonable based on exigent circumstances. The court reasoned: "The motion will be denied. In my view the fact that the two men turned immediately upon seeing the police and quickly hid themselves by entering an apartment and locking it, while doing so grabbed the waist, a suggestion of possession of a weapon, all gave a reasonable officer a suspicion that the men were armed. When that's followed by a statement of the owner that he doesn't know who the men are or why they had gone in, then the fact that there are children inside creates an exigent circumstance. And the officers' protection of the children would justify further investigation and desire to enter."

The court declined to rule on whether defendant consented to the search of his apartment, finding it "unnecessary to my decision since I believe exigent circumstances existed to protect the children," and the deputies had the right to enter whether they had the keys or not.

5

## DISCUSSION

### I. *Right to Enter*

Defendant contends that the evidence did not support the trial court's finding that the entry of the defendant's apartment was supported by exigent circumstances. Therefore, all items seized from the apartment should have been excluded as fruit of the illegal initial entry. We disagree.

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Consistent with Fourth Amendment protections, police officers may enter a residence without a warrant when they are aware of facts suggesting the need to prevent imminent danger to life or serious injury. "'"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."' [Citation.] "'"There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers."'" [Citation.] . . . [¶] "The '"emergency aid exception"' to the warrant requirement 'does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.' [Citation.] Rather, the exception 'requires only "an objectively reasonable basis for believing . . ." [citation] that "a person within [the house] is in need of immediate aid."' [Citation.] 'We are to approach the Fourth Amendment . . . with at least some measure of pragmatism. If there is a grave public need for the police to take

6

preventive action, the Constitution may impose limits, but it will not bar the way.' [Citation.]" (*People v. Troyer* (2011) 51 Cal.4th 599, 605-606 (*Troyer*).)

Here, the testimony credited by the trial court showed that upon observing the deputies, two of the men on the porch of the apartment ran inside the apartment and locked the door. One or both of them had their hands at the waistband of their pants as if concealing a firearm. Detective Coberg found methamphetamine on the third man who remained outside, Detective Vavakin found the front door locked, began knocking, asked that the door be opened, and heard children's voices inside, talking and yelling. Yet no one answered or acknowledged his presence.

On these facts, the deputies' belief that immediate action was necessary to prevent imminent danger to life was reasonable. One of the men outside the apartment possessed methamphetamine. The other two men suspiciously ran inside the apartment and locked the door. At least one of the men who fled inside (and perhaps both) clutched his waistband in a gesture commonly associated with concealing a handgun. No one responded to Detective Vavakin's knocks or request to open the door, even though he heard the voices of children inside talking and yelling.

The deputies' concerns were further aroused when defendant, having walked up the driveway, told Detective Vavakin the apartment was his, that he did not know the men who had fled into the apartment, and that, "I only have my kids in there." Also, Deputy Coberg had approached the apartment, knocked on the door, and heard fast moving footsteps and a female voice.

On these facts, the deputies had an objectively reasonable belief that entry into the apartment was required to protect the children and woman inside from the risk of serious injury or death from one (and perhaps two) armed intruders. "[W]hen we balance the nature of the intrusion on an individual's privacy against the promotion of legitimate governmental interests in order to determine the

7

reasonableness of a search in the circumstances of an emergency [citation], we must be mindful of what is at stake. The possibility that immediate police action will prevent injury or death outweighs the affront to privacy when police enter the home under the reasonable but mistaken belief that an emergency exists." (*Troyer, supra*, 51 Cal. 4th at p. 606.)

Thus, the deputies had the right to enter the apartment. Detective Vavakin obtained the keys from defendant, and gave them to Deputy Coberg, who used them to open the door. Inside, he saw a woman and two young children (around 10 years old), but not the two men who had run into the apartment. He instructed the woman and children to exit, and they complied. He asked the woman if she knew the two men who ran into the apartment. She seemed confused, and said "I don't know anything. I don't know what's going on." Deputy Coberg then ordered the two men to come out, and after short time they complied.

Defendant contends that in cases upholding entry on the basis of an emergency, "there were solid and reliable facts" justifying the entry, which he asserts were absent here. He attacks the credibility of Detective Vavakin and Deputy Coberg concerning the sounds they heard inside the apartment, pointing to inconsistencies and corrections they made in their testimony on other points under cross-examination. He asserts that the deputies were motivated by a desire "to detain and search all males observed in the area close to appellant's apartment." However, these contentions miss the mark. The standard by which the deputies' conduct is judged is not properly characterized as a "solid and reliable fact" test, but simply "whether there was an objectively reasonable basis for believing that an occupant was seriously injured or threatened with such injury." (*Troyer, supra*, 51 Cal. 4th at p. 607.) Further, it was for the trial court, not this court on appeal, to judge the credibility of the deputies' testimony, and we will not substitute our judgment for that of the trial court. Finally, as we have noted, the deputies'

8

subjective intent is irrelevant, so long as the facts known to them objectively justified their conduct. And as we have discussed, substantial evidence supports the trial court's finding that the facts known to the officers gave them the right to enter the apartment.

II. *Protective Sweep*

Defendant contends that even if the deputies initially had the right to enter the apartment, that right dissipated once the woman and two children exited the apartment, followed by the two men who had fled inside. Therefore, Deputy Coberg had no right thereafter to enter and make a protective sweep of the apartment. We disagree.

The touchstone of the Fourth Amendment is reasonableness. "Generally, a court will find a warrantless entry justified if the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1157.) Here, the exigencies giving the right to enter the apartment did not simply disappear when the woman, two children, and the intruders exited. Before entering, Detective Vavakin observed a shotgun leaning against the wall inside the apartment. The woman who exited with the two children seemed confused, and said she did not know what was going on. The deputies had no information as to how many children might have been inside (they had earlier heard only voices), and could reasonably be concerned that another child might have been present and potentially in danger from being alone with a shotgun present. These specific facts reasonably suggested that a brief entry was necessary to ensure there were no additional children were inside who might be in danger. Indeed, it is difficult to imagine on these objective facts that a reasonably prudent officer would not have taken that step.

9

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.